UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM E. DYER,<br><br>    Defendant | No. 1:21-CR-10314-WGY |

## GOVERNMENT'S SENTENCING MEMORANDUM

From 2014 to 2018, defendant William E. Dyer deliberately evaded his responsibility to pay a significant portion of his tax obligations on income from his paving business, primarily by directing customers to make checks out to him and then cashing those checks. In total, Dyer failed to report nearly $1.7 million in income, resulting in his failure to pay taxes of approximately $597,881.

The government respectfully submits that a sentence of 24 months imprisonment—equal to the bottom of Dyer's sentencing guideline range—is sufficient but not greater than necessary in this case. The government also recommends one year of supervised release and requests that the Court order restitution of $597,881 to the Internal Revenue Service (IRS).[1]

## BACKGROUND

Dyer was the owner and operator of Pilgrim Paving, a paving company in Hanover, Massachusetts. [Presentence Investigation Report ("PSR") ¶ 6.] From 2014 to 2018, Pilgrim Paving received gross income of at least $9.05 million from commercial and residential paving jobs. [PSR ¶ 8.] Like all business owners earning income, Dyer was required to report to the

---

[1] On May 3, 2022, Dyer's counsel informed the government that Dyer's accountant believes that the IRS's calculation overstates Dyer's unpaid taxes. The government will examine this potential discrepancy and be prepared to address it at the scheduled sentencing.

IRS the full amount of his business's gross receipts and pay the income tax obligations that flowed from those receipts. Dyer willfully failed to do so.

During tax years 2014 through 2018, Dyer failed to report a substantial portion of Pilgrim Paving's gross receipts on his tax returns. The government's investigation found that Dyer diverted a portion of Pilgrim Paving's income to himself by directing customers to issue hundreds of checks for paving jobs to Dyer personally, rather than to the business. [PSR ¶ 9.] Instead of depositing these receipts into Pilgrim Paving's bank account, Dyer cashed these checks. Dyer did not report this additional income on the tax returns that he signed and submitted for tax years 2014 and 2015. With respect to 2016, 2017, and 2018, Dyer did not disclose the additional income to his tax preparer, and Dyer told his tax preparer that he had no income in addition to the income he reported to his tax preparer. *Id.*

In addition to the cashed checks, Dyer deposited additional business receipts into Pilgrim Paving's bank account, which he also failed to disclose to his tax preparer or report as income on his tax returns. [PSR ¶ 10.]

In total, Dyer underreported Pilgrim Paving's gross receipts by approximately $1.7 million for these tax years. Consequently, Dyer avoided paying $597,881 in tax he owed on the omitted receipts over that time period. [PSR ¶ 12.]

In October 2021, the government charged Dyer by Information with one count of tax evasion, in violation of 26 U.S.C. § 7201. Dyer pleaded guilty to this charge on November 18, 2021. [Dkts. #1, 6.]

The parties and Probation agree on Dyer's guideline calculation. Based on the amount of the tax loss, which exceeds $550,000, Dyer's base offense level is 20, which is then reduced by three levels based on acceptance of responsibility. *See* U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(H),

3E1.1.  The reduction results in a total offense level of 17 and, with no criminal history points, a guideline range of 24 to 30 months imprisonment, along with supervised release between one and three years.  [PSR ¶¶ 106, 109.]

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The below assessment of the § 3553(a) factors demonstrates that a sentence of 24 months incarceration is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A. Nature and Circumstance of the Offense

Dyer's deliberate failure to pay nearly $600,000 in taxes related to his business, spanning four years, is a serious offense.  Dyer directed checks to be paid to him personally on hundreds of occasions.  [PSR ¶ 9.]  With each of these checks that he received and failed to report on his taxes or to his tax preparer, Dyer deprived the government of tax funds, cheated his fellow taxpayers, and placed himself at an unearned advantage over competitors who played by the rules.  Dyer's practice of diverting these payments to himself represents a deliberate decision to shirk a significant portion of the taxes he owed on his income from the paving business.  And while Dyer has taken responsibility for his misconduct, there is no indication that he intended to pay his full share of taxes on income from the project before federal agents discovered the unreported receipts.

### B. History and Characteristics of the Defendant

Dyer's history offers no significant mitigating circumstances or support for any downward variance from the guideline sentence.

Despite early disadvantages that are detailed in the PSR and Dyer's Sentencing Memorandum [PSR ¶ 73; Dkt. # 23], Dyer built a successful business that enabled him to support, at various times, a parent, a spouse, and several children.  [PSR ¶¶ 75, 84.]

Dyer's success was aided, in part, by his evasion of his tax obligations. The taxes that he failed to pay enhanced his ability to charge competitive prices, hire workers, and invest in his business. While the government has no reason to doubt that Dyer's success is also due to hard work, Dyer nevertheless pocketed nearly $600,000 in the span of only a few years—money that, instead of paying to the IRS, Dyer kept available to him to use for considerable business investments or personal expenses.

While a period of incarceration may present challenges for Dyer's continued operation of his businesses, such considerations also should not preclude a sentence of incarceration. The fact that a person owns a business, earns an income, employs others, or supports a family should not shield him from serving a sentence of incarceration. To allow otherwise would be to advance two systems of justice—one for fortunate business owners and another for those without the same means and opportunities.

**C. Deterrence and Promoting Respect for the Law**

As noted in the Sentencing Guidelines manual, the "criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system." U.S.S.G. Part T (Offenses Involving Taxation), Introductory Comment. That tax system is the foundation of our government's ability to serve and protect its citizenry. The integrity of that tax system is dependent on voluntary compliance. Where, as here, a successful business owner chooses to skirt his tax obligations over an extended period, he undermines that system, not just by depriving the government of the funds not contributed, but also by undermining confidence in the system itself. Others are inclined to ask themselves, why should I voluntarily pay my fair share when others do not? It is easy to take for granted—and to destabilize—a system that depends in overwhelming part on the collective confidence that we are all contributing for the

4

common good.  For these reasons, "tax crimes represent an especially damaging category of criminal offenses, which strike at the foundation of functioning government."  *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (quoting favorably the district court's sentencing rationale).

Given the nature of this damage, a period of incarceration is necessary to afford adequate general deterrence and to promote respect for the law among other would-be tax cheats.  Tax offenses that result in significant underreporting or unpaid employment taxes are necessarily committed by those with means.  And it is also the case that the government cannot reasonably be expected to catch every such offender.  Deterrence, accordingly, is critical, and therefore so is the message to would-be tax offenders that they stand to lose not just their ill-gotten gains, but also their liberty.  *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that economic and fraud-based crimes are "prime candidates for general deterrence" because they are "more rational, cool, and calculated than sudden crimes of passion or opportunity" and "therefore can be affected and reduced with serious punishment") (internal citation omitted).  Indeed, the sentencing guidelines for tax offenses were drafted specifically with deterrence in mind.  *See* U.S.S.G. Part T, Introductory Comment (noting that "deterring others from violating the tax laws is a primary consideration underlying these guidelines").

The need for meaningful general deterrence is reinforced by the fact that, as the IRS recently noted, "small declines in compliance cost the nation billions of dollars in lost revenue and shift the tax burden away from those who don't pay their taxes onto those who pay their fair share on time every year."  *See* IRS.gov, "The Tax Gap: Tax Gap Estimates for Tax Years 2011-2013," available at https://www.irs.gov/newsroom/the-tax-gap (last visited November 5, 2021).  The IRS estimates that, for the years 2011-2013, approximately 83.6% of taxes were paid

voluntarily and on time, with enforcement efforts lifting the percentage up to (only) 85.8%. *Id.* While the IRS characterizes this as a "relatively high and stable voluntary tax compliance rate," it also reflects a gross tax gap of $441 billion per year, before late payments and enforcement efforts are considered. Meaningful sentences to terms of imprisonment for tax offenders are critical to ensuring that this gap does not grow. Such sentences are also important to ensure our criminal justice system does not treat those with means and status different than those without. *See United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing the importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

### D. Avoiding Sentencing Disparities

A sentence to a meaningful period of incarceration also would be consistent both with national averages and other sentences imposed in this district. The IRS reports that, for employment tax offenses for the period 2018-2020, the average incarceration rate was 77-84% and the average length of prison sentences was 18-23 months. *See* IRS:CI, Annual Report 2020, at 67 (Appendix), available at https://www.irs.gov/pub/irs-pdf/p3583.pdf (last visited November 5, 2021). Similarly, the Sentencing Commission reports that, for Fiscal Year 2020, the average sentence for tax offenders was 16 months imprisonment, with 68.7% of tax offenders being sentenced to prison. *See* U.S. Sentencing Commission, Quick Facts: Tax Fraud Offenses, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quickfacts/Tax_Fraud_FY20.pdf (last visited November 5, 2021). This average sentence of 16 months

equals approximately 62% of the average guideline minimum of 26 months.[2]  *Id.*  The Sentencing Commission further reports that approximately 85% of tax offenders had little or no scored criminal history, just as Dyer does not.  *Id.*  In addition, the median loss amount for tax offenses was just under $340,000, or approximately 57% of Dyer's tax loss amount, reflecting the relative severity of Dyer's offense.  *Id.*

In considering the issue of unwarranted disparities in sentences, the Court should consider the need to avoid sentencing disparities between this crime and other crimes motivated by the desire to obtain money–not just disparities between this tax fraud and other frauds, but also disparities between this crime and drug crimes, for instance.  The need to avoid disparities between such crimes and the gulf between white collar sentences and non-white collar sentences calls strongly for a serious sentence here where a business owner chose for several years to deliberately flout the law and cheat his fellow-taxpayers.

Accordingly, this Court and others in this district have repeatedly sentenced such tax cheats to jail time, even in cases with much lower tax losses.  *See, e.g.*, *United States v. Haddad*, 20-CR-40024-TSH (eight months incarceration for tax fraud with loss of approximately $292,000); *United States v. Harry Richard*, 18-CR-10073-NMG) (one year and one day of incarceration for tax fraud by roofing business owner with restitution of $353,246); *United States v. George Fenzel*, 14-CR-40005-THS (16 months incarceration for dentist who concealed his income after downward departure due to cooperation, restitution of $157,407); *United States v. Carey*, 16-CR-10354-ADB (18 months incarceration for accountant who failed to report income with tax loss of $355,535); *United States v. Bonefant*, 15-CR-10204-PBS  (15 months

---

[2] In this case, 62% of the guideline minimum (24 months imprisonment) would be just around 15 months imprisonment.

incarceration for bankruptcy fraud and tax fraud with loss of approximately $389,000); *United States v. Nicholas Koudanis*, 15-CR-10387-PBS (two years incarceration for tax evasion with tax loss of approximately $2 million).

## CONCLUSION

Dyer made a deliberate choice to take advantage of the federal tax system for personal profit at the expense of the United States and other honest taxpayers. The government respectfully recommends that the Court sentence Dyer to 24 months of imprisonment and one year of supervised release, as well as impose restitution in the amount of $597,881.

                        Respectfully submitted,

                        RACHAEL S. ROLLINS
                        United States Attorney

By:   /s/ *David M. Holcomb*
         DAVID M. HOLCOMB
         Assistant United States Attorneys
         John Joseph Moakley United States Courthouse
         1 Courthouse Way, Suite 9200
         Boston, MA 02210
         (617) 748-3000

Dated: May 7, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        /s/ *David M. Holcomb*
                                        David M. Holcomb
                                        Assistant United States Attorney

Date: May 7, 2022